CARRIE B. COULTERS *vs.* THE SAND MAN, INC. *et al.*

JULY 29, 1935.

PRESENT: Flynn, C. J., Moss, and Capotosto, JJ.

CAPOTOSTO, J.   This case is before us on a bill of exceptions prosecuted by the J. W. Bishop Company to the decision of the superior court charging it as garnishee.

The material facts in this case up to a certain point are set forth in detail in the case of *Coulters* v. *The Sand Man, Inc. et al.*, 53 R. I. 151.   We deem it necessary, however, to briefly state certain of those facts together with others not before the court at that time in order that the effect of that decision upon the issue before us may more clearly appear.

The plaintiff, on October 23, 1931, attached the J. W. Bishop Company as garnishee of the defendants, The Sand Man, Inc. and Leo Minutella, in an action in assumpsit. The garnishee, within the proper time, filed an affidavit setting forth, among other things, an assignment in writing by the defendant, The Sand Man, Inc., in favor of the Colonial Finance Corporation, and certain individuals as assignees.   The case was duly answered by the defendants and on April 25, 1932, it was discontinued as to the defendant Minutella and defaulted as to The Sand Man, Inc.   On May 31, upon an *ex parte* motion by the plaintiff, decision was given for the plaintiff in the sum of $2,414.40 and costs, the garnishee was charged for that amount, and judgment was at once entered against the defendant, The Sand Man, Inc.   Thereupon, the J. W. Bishop Company, on June 3, filed its motion "to vacate the judgment and the order charging the garnishee."   On the same day, the Colonial Finance Corporation, without having become a party to the cause, filed a motion therein, as assignee under the aforesaid assignment, that the execution theretofore issued be recalled, that the order charging the garnishee be vacated and the

garnishee discharged, and that an order be entered directing the garnishee to pay the fund in its hands to the Colonial Finance Corporation. On this same day the court ordered that the execution be stayed until further order. From this point on there was confusion due to the fact that two different proceedings were being followed at the same time.

On June 7, the J. W. Bishop Company filed an exception and notice of intention to prosecute a bill of exceptions to the decision of the court on May 31 charging it as garnishee. On July 14 the bill of exceptions, which is the only matter now before us, was filed in the superior court by the garnishee together with a transcript; and on the next day both were allowed. On the latter day, after there had been a hearing on the two motions above described, they were both denied. To the decision denying the motion of the garnishee no exception was filed. To the decision denying the motion of the Colonial Finance Corporation it duly filed an exception and notice, and later a bill of exceptions based thereon was filed by that corporation, together with a transcript. In due time they reached this court.

In this court the plaintiff filed motions to dismiss both bills of exceptions and this action resulted in the opinion hereinbefore cited, which granted the motion in the case of the Colonial Finance Corporation, because it was not a party to the suit, and denied it as against the J. W. Bishop Company, on the ground that as garnishee it was a party in the case and as such was entitled to prosecute a bill of exceptions. Without expressing any opinion on the merits of the issue raised by the J. W. Bishop Company's bill of exceptions, the court stated that, as the case was an answered one, "the entry of judgment on the day the decision was rendered was invalid."

Certain facts are beyond question. The decision of the court on May 31 was based on an *ex parte* proof of claim and the garnishee, the J. W. Bishop Company, was charged solely from what appeared in its affidavit, without any opportunity being given to the court through the presenta-

tion of testimony to consider the validity, meaning and scope of the assignment therein set out. Upon receiving notice that it had been charged as garnishee, the J. W. Bishop Company, as above stated, on June 3, with reasonable diligence moved in the superior court to vacate "the order charging the garnishee," and on June 7 filed its exception and notice.

The decision of the court on May 31 was qualified and not absolute. It undoubtedly had in mind the probability of further proceedings at the request of those in interest when it said: "I think I will let you charge them and if they want to come in with something else they may." This original and fundamental reservation made by the court for the benefit of a party to the suit that might consider itself aggrieved unfortunately was subsequently overlooked. The validity, meaning and scope of the assignment to the Colonial Finance Corporation and to others, as set forth in the garnishee's affidavit, has never received a judicial determination. In our opinion the rights of the parties cannot be determined without an adjudication of this material point. The claimant under the alleged assignment should have been made a party to the case and this point determined before the entry of any decision charging the garnishee. *Hanaford* v. *Hawkins*, 18 R. I. 432; *Westminster Bank* v. *Atherton*, 24 R. I. 334. This being an answered case, no judgment could legally be entered before the determination of the question of the liability of the garnishee. *Coulters* v. *The Sand Man, Inc.*, 53 R. I. 151, 153, *supra.*

The exception of the J. W. Bishop Company is sustained and the case is remitted to the superior court with directions to vacate the decision charging the garnishee, to vacate the judgment against the defendant and to stay the entry of judgment until final determination of all questions pertaining to garnishment, and for further proceedings in accordance with this opinion.

*Frank H. Wildes*, for plaintiff.

*Ralph M. Greenlaw*, for J. W. Bishop Co., garnishee.

GLENS FALLS INDEMNITY COMPANY *vs.* AMERICAN AWNING & TENT CO., *et als.*

JULY 29, 1935.

PRESENT: Flynn, C. J., Capotosto, Baker, and Condon, JJ.

CONDON, J. This is a bill of complaint in the nature of a bill of peace brought to determine certain controversial questions and to prevent a multiplicity of suits. The questions raised have been certified by the superior court to this court in accordance with section 36 of chapter 339 of general laws 1923.

The case arises out of three bonds executed by the Sherry Construction Company, Inc., as principal, and the Glens Falls Indemnity Company as surety. These bonds were given to the State of Rhode Island in connection with three

certain road construction contracts between the state, through the state board of public roads, and the said construction company. The three jobs under these contracts were known as the Newport Avenue job in Pawtucket and East Providence, the Danielson Pike job in Scituate and Foster, and the Main street job in Warren and Bristol. The Newport avenue job was completed by the construction company to the satisfaction of the state. The other two jobs were completed to the satisfaction of the state by the surety company after the state had declared the construction company in default. The surety company claims it suffered a loss of $22,987.19 on the Danielson Pike job, and $6,866.50 on the Main street job.

Certain creditors of the construction company on each of the jobs, who are made parties to this proceeding, remain unpaid. No creditors of the surety company on either of the jobs completed by it are unpaid. In accordance with Division I of the general provisions, section 1.69, of the Standard Specifications for Road Construction, the state board of public roads is withholding the sum of $18,500, earned by the construction company on the three jobs. This sum represents what are called the "retained percentages" on the jobs, and is claimed by the surety company under an assignment made to it by the construction company in connection with the execution of each bond to indemnify the surety company against liability for loss on such bonds, and independently of this assignment by operation of law and by subrogation, at least as to the last two jobs.

There have been certified to us three questions, as follows:

"1. Is the complainant, as surety on the contractor's bond for each contract of those involved in this cause, under any liability to any o the persons who have furnished labor or materias or both which have been used in the performance of any such contract?

"2. If the answer to '1.' be in the affirmative, then is complainant liable under any such bond— (Then follows a long list of claims against said construction company which need not be set out here because of our answer to question 1.)

"3. If the complainant has sustained the losses set forth in its bill of complaint in performing the completion contracts G and H which are referred to in its bill of complaint, is it entitled, by reason of such losses, to *recover the amounts* of money retained by the State Board of Public Roads and referred to in paragraph 13 of said bill of complaint and described in paragraphs 3, 6 and 9 thereof as 'retained percentages,' or to *recover any of said amounts?*"

The answer to question 1 is dependent upon the construction given to the series of documents described here as "Standard Specifications for Road Construction, Notice to Contractors, Form for Proposal, Contract, and Contract Bonds." A proper understanding of the scope of the bond, and of the obligation it imposes, cannot be had without reading the contract and the bond, and construing them together. Certainly the bond itself contains no language clearly imposing upon the principal and surety the express obligation to pay for material and labor. The obligation of the bond seems to imply that the contractor and his surety undertake to assure performance of the contract with the state to build the highway in accordance with the plans and specifications. Other matters are stated in the condition of the bond but they are not so stated as to clearly express an obligation binding upon either principal or surety. We think a specific undertaking to pay for labor and materials ought to positively appear within the bond itself, or inasmuch as the bond is only one of a series of instruments, in some one of such instruments clearly incorporating by reference such provision as a part

of the bond. We must, therefore, look for such a provision in the contract or in other instruments incorporated in it.

The contract does not contain such a provision but it does provide that: "The said plans, specifications, the notice to contractors, and the proposal are hereby made a part of this agreement as fully and to the same effect as if the same had been set forth at length in the body of this agreement." It also makes the contract bond a "part of this contract." Neither the proposal nor the notice to contractors contains any language expressly and positively obligating the contractor to pay for labor and materials, although the proposal does contain an express agreement of the contractor "to provide all necessary equipment, tools, labor, incidentals, and other means of construction to do all the work, and furnish all the materials of the specified requirements which are necessary to complete the work in accordance with the Proposal, the Plans, and the Specifications . . ." And this proposal, the plans for the work and the standard specifications are therein made a part of the contract.

The standard specifications are contained in a manual of one hundred forty-five printed pages issued by the state board of public roads. It is divided into three separate divisions as follows: I, General Provisions; II, Construction Details, Earthwork; III, Material Specifications. Under Division I, General Provisions, Definition of Terms, is the following definition: "Surety. The corporate body which is bound with and for the contractor, who is primarily liable, and which engages to be responsible for his payment of all debts pertaining to and for his acceptable performance of the work for which he has contracted."

The following numbered paragraphs or sections also appear thereunder:

"1.17 Requirements of Contract Board. The successful Bidder, at the time of the execution of the contract, shall deposit with the Board a surety

bond in a sum of not less than fifty (50) percentum of the contract price for the faithful performance of the contract and for the prompt payment in full of all just debts for labor, materials and equipment incurred in the construction or improvement herein contemplated. The form of the bond shall be that required by the Board and the surety shall be acceptable to the Board.''

''1.20    Intent of Plans and Specifications. The intent of the plans and specifications is to prescribe a complete work or improvement which the contractor undertakes to do in full compliance with the plans, specifications, special provisions, proposal, and contract.

''The contractor shall do all the work and furnish all the materials, tools and appliances, except as herein otherwise specified, necessary or proper for performing and completing the work required by the contract, in the manner and within the time therein specified. All the work, labor and materials to be done and furnished under the contract shall be done and furnished strictly pursuant to, and in conformity with the specifications, the plan or plans of the work on file in the office of the Board, and in conformity with the directions of the engineer as given from time to time during the progress of the work, subject, however, to the right of the Board to change such plans and specifications as provided in Section 1.22 hereof.  .  .  .''

''1.69    Contractor to pay Workmen and Material Men. The contractor shall pay promptly all workmen employed by him upon all work involved in this contract and also all persons furnishing materials thereunder, and also shall pay promptly for the hire of all tools and appliances loaned to said Contractor by any public authority, and will

furnish the Board with satisfactory evidence that all persons who have done work or furnished materials or loaned tools and appliances as aforesaid under this contract and shall have filed claims of non-payment therefor with the said Board have been fully paid and are not entitled to any lien under the laws of this State. In case evidence is not furnished as aforesaid, such amount as the Board considers necessary to meet the lawful claims aforesaid, shall be deducted from the moneys due said Contractor under this Contract, and such amount shall not be allowed until the liabilities aforesaid shall have been fully discharged and evidence thereof furnished the Board. If such evidence is not furnished the Board before final payment under this contract falls due, said Board may pay such claims in whole or in part to the person or persons, firm or corporation, claiming the same, and charge the amount thus paid to the contractor, who shall accept the same payment to the amount thereof upon this contract."

It is on these paragraphs that the respondents rely for their contention that the bond, notwithstanding the absence of clear, positive, definite language therein, obligates the surety to pay for labor and materials furnished for the construction of these highways. According to them, all the language in the above paragraphs of the printed manual as well as the definition of the word "Surety" is to be read into the bond, and not only is it to be so read, but it is also to be given that interpretation that will render it an express obligation on the contractor and the surety to pay for labor and materials as though these words were actually used in the bond. The respondents also insist that by force of the reference to the "Specifications" in the contract, this must be so. And upon the validity of this contention, largely, they rest their claim to an affirmative answer to question I.

If this is a bond to pay for labor and materials, then the respondents cite to us the recent decision of this court in *United States Fidelity & Guaranty Co.* v. *Rhode Island Covering Co.*, 53 R. I. 397, as authority for an affirmative answer. In that case, one of the specific conditions of the bond itself was "and shall pay for all labor performed or furnished, and for all materials used in the carrying out of said contract," and it was held that: "By the weight of the authorities in the United States, such a surety contract or bond imposes on the surety the obligation of paying materialmen and subcontractors." This holding was incidental and at the same time fundamental to the real decision that the rights of a surety on such a bond who assumed the obligation thereunder to pay for labor and materials were superior to those of an attaching creditor of the contractor in retained funds in the hands of the obligee of the bond.

The complainant here does not contest the correctness of the holding in that case, but strongly urges that it does not apply because the bond in the instant case is merely a "performance" bond and cannot be construed to be a bond to "pay for labor and materials." The *Rhode Island Covering Co.* case, therefore, is of no assistance in answering question I as certified to us in this proceeding, unless we find that this bond is not merely a performance bond but also a bond to pay for labor and materials.

We have not been able to find a case exactly like the present one nor have counsel cited any to us. Here is a long series of instruments only one of which is actually executed by the surety. None of the executed instruments contain any language that can fairly and reasonably be said to express a positive obligation under the contractor or the surety to pay for labor and materials. It is only by referring at last to a long printed document and by examining it carefully that we find expressions upon which the respondents base their argument that there is such an obligation on the surety. It is significant that these expressions, although particularly marked off in the manual, are not specifically

referred to in any of the other instruments. The surety is left to find them by a general reference in the bond and in the contract to the "Specifications." By reference to this word, the respondents insist that an incorporation into the condition of the bond of all of the one hundred forty-five pages of the manual is made.

This does not seem reasonable to us. In the first place, an examination of the manual itself leads us strongly to the conclusion that the word "Specifications" has a more limited meaning than that claimed for it by the respondents. It is divided into three distinct divisions, the first of which relates largely to what may be termed legal and business formalities and details in the nature of general information and instructions and is denominated "Division I. General Provisions." The remainder of the document is concerned exclusively with matters of engineering and general construction, and is set out as "Division II. Construction Details, Earthwork" and "Division III. Material Specifications." A cursory examination of the various subheadings of these divisions leads us to the conclusion that these two latter divisions are really the "specifications" intended to be referred to in the bond and contract. Viewed in this way, the word "specifications" is not used beyond the sense of its definition as given in Webster's International Dictionary: "A written or printed description of work to be done, forming part of the contract and describing qualities of material and mode of construction, and also giving dimension and other information not shown in the drawings."

Divisions II and III are specifications relating to methods and materials of construction. In a bond, conditioned upon performance of a construction contract, it is both reasonable and practical to refer the obligor to these details by a reference thereto without reciting them. It is not reasonable nor practical to omit from the bond definite, substantial obligations to third parties and refer the obligor through a series of other instruments in order to find them, if they

exist, among a mass of engineering matter and construction details. We think, therefore, that the reference to the specifications in the contract is meant to apply more particularly to Divisions II and III of the manual, which deals with matters of construction methods and materials. This conclusion is strongly supported, it seems to us, by the manner of stating the reference in the contract in the following words in the first paragraph thereof: "In strict conformity with the provisions of this contract, the notice to contractors, the proposal, *the specifications and the plans approved by the Engineering Executive.* The said plans, specifications, the notice to contractors, and the proposal are hereby made a part of this agreement as fully and to the same effect as if the same had been set forth at length in the body of this agreement." (Italics ours.) The italicized words indicate quite clearly that the matters intended to be referred to by the word "specifications" are such as the obligee of the bond, the state, acting through the state board of public roads, would have its engineering executive approve. These words manifestly would have nothing to do with the formal legal requisites of the obligation which the obligee would have the obligor assume by entering into the bond.

In this view of the bond, it is not necessary to consider the effect which the sections of the standard specifications hereinbefore quoted would have, if we read them into the contract. Nevertheless, we shall consider them briefly. Authorities have been cited to us by the respondents to support their contention that the language of these sections of the specifications, if read into the bond, would impose an obligation on the surety to pay for labor and materials. We have carefully examined these authorities.

Probably the strongest case cited by the respondents is *Clinton Bridge Works* v. *Kingsley*, 188 Ia. 218. It is not quite clear from a reading of the court's opinion just what was the language of the instructions to bidders providing for a bond. At the top of page 225, the court says: "In

the instructions to bidders, there is a stipulation that the successful bidder must furnish a bond for 50 per cent of the contract price, which shall be drawn to protect the county and any subcontractor." Later in the next paragraph, the opinion goes on to declare that "the proof shows an express promise that any materialman who furnished labor or material . . . shall be paid for such labor and material . . ." If what is meant by this language is that a statement in the proposal or the specifications specifying that the required bond shall contain a promise to pay for labor and materials is equivalent to language setting out an express promise or undertaking in the bond or contract itself, then we cannot follow that reasoning. The weight of authority on that point is clearly the other way. "In order for the laborer or materialman to recover, there must not only be an intent to secure some benefit to him, but there must also be a legally enforceable promise for his benefit. *Electric Appliance Co.* v. *United States Fidelity & Guaranty Co.*, 110 Wis. 434, 53 L. R. A. 609, 85 N. W. 648; *Builders Material & Supply Co.* v. *J. B. Evans Construction Co.*, 204 Mo. App. 76, 221 S. W. 142." Note 77 A. L. R. 89.

If, by reading the provisions of the standard specifications quoted above into the contract in the instant case, it could be fairly said to expressly obligate the contractor to pay for labor and materials, then the obligor on the bond would be likewise bound because his obligation is conditioned upon compliance by the contractor with all the terms and conditions of the contract. But section 1.69 of the Standard Specifications does not impose upon the contractor an express obligation to pay for labor and materials. It leaves the question an open one to be disposed of at the option of the contractor either by making payment himself or by permitting the board to make such payment out of moneys deducted from the amounts earned by the contractor as therein provided. Here is clearly an optional method of payment and not a positive obligation imposed upon the

contractor. The language of the said section, it seems to us, amounts to this and no more. The contractor may claim full payment for moneys earned by showing that all claims for labor and materials have been met or he may accept payment subject to deductions charged against him for the payment of these claims. This language even if read into the bond certainly cannot be construed as an unequivocal and positive obligation on the surety to pay claims for labor and materials. The effect of such a provision has been frequently held in other jurisdictions to be for the protection of the public body and not for the benefit of materialmen and laborers. *Montgomery* v. *Rief*, 15 Utah 495; *Electric Appliance Co.* v. *United States Fidelity & Guaranty Co., supra; Wilson* v. *Nelson*, 54 Okla. 457; *Ludowici-Celadon Co.* v. *Netcott*, 186 Ia. 730; *Hunt* v. *King*, 97 Ia. 88; *Staples-Hildebrand* v. *Metal Concrete Chimney Co.*, 62 Ind. App. 592; *McCausland & Co.* v. *Brown Construction Co.*, 172 N. C. 708. A few states have held to the contrary, but we think the principle enunciated in these cases is the sounder one. At least it is the better rule for construing the effect of the language in the specifications in the instant case.

The respondents also direct our attention to the language of section 1.17 of the Standard Specifications above quoted and urge very strongly that this provision makes the surety liable to pay claims for labor and materials. We do not think so. In the absence of a statute specifying definite requirements of a surety bond on public works contracts, the state board of public roads has, by these standard specifications, laid down certain requirements to which the contract bond must conform. The board, however, owes no duty to third parties to take a bond containing these requirements, and is not itself bound to do so. The state is not here asserting that the board was bound to take such a bond only, or that even section 1.17 was for the benefit of subcontractors. The board was free, if it so chose, to

waive these requirements and take a bond without them. We think it did so in this case.

There is a conflict of authorities on this point. Some hold that the requirement exists notwithstanding absence of express terms of such an obligation in the bond. *Daughtry v. Maryland Casualty Co.*, (1931: 4th C. C. A.) 48 F. (2d) 786; *Tug River Lumber Co. v. Smithey*, 107 W. Va. 482. (Cited by the respondents.)

In the *Daughtry* case, *supra*, however, the court admitted that: "It is well settled that where neither the contract nor the bond provides for the payment of labor and material claims, these are not protected, even though there be a statute requiring their protection. And this is true although the contractor is required to furnish the labor and materials at his own cost and expense."

It held the surety liable, nevertheless, for the reason that the bond and contract were conjoined in the one instrument and were executed concurrently; and that the contract contained an express agreement to give a bond guaranteeing "the payment of the laborers' wages, bills for materials, and all expenses incurred by the contractor." The court seems to have viewed this transaction as creating a present obligation and not a promise to enter into such an obligation in the future, PARKER, C. J., saying: "In the case at bar, the contract provided that the bond to be given should guarantee not only the faithful performance of the contract, but also the payment of the bills for labor and materials. This was not left to future action, but the bond was executed concurrently with the execution of the contract, and the latter so states, the language being that the 'contractor . . . will, and concurrent with this contract, does execute a bond . . . guaranteeing . . . the payment of the laborers' wages, bills for materials, and all expenses incurred by the contractor.' " This is not the situation in the instant case. The contract here contains no language remotely resembling this, nor does section 1.17 which the respondents desire to have read into it. If we refer

to the standard specifications for the language which respondents claim imports an obligation, we find merely what amounts to a general notification by the board to all bidders that it will require a certain bond before the acceptance of any bid and the closing of a contract. But neither in the bond in the instant case, nor in the contract does it carry this intention into effect.

The *Tug River* case, *supra*, is readily distinguishable because there a statute imposed a duty on the board of education to require a bond to satisfy the claims of mechanics and materialmen. The contract contained the agreement to give such a bond. Construing the documents before it together, the court held that the statute operated to read the contractual agreement into the condition of the bond. Even statutory requirements, as in this case, have been in other jurisdictions held ineffective where the bond actually given does not contain the positive express obligation.

Opposed to the general doctrine of the above cases is a line of cases of which *United States, to Use of Zambetti* v. *American Fence Construction Co.*, (C. C. A. 2d. 1926) 15 F. (2d) 450, is representative. There the court held that, notwithstanding a statutory, as well as a contract requirement therefor, a government contractor's bond, not containing an express obligation to pay for labor and materials, would not make the surety liable to a laborer or materialman. See also other cases cited in the note in 77 A. L. R. at the bottom of page 181, and up to and including page 184. As no statute is involved in the case before us, we express no opinion on this phase of the question.

If the intention and desire of the board is to protect claims of subcontractors against contractors on contracts with the state, it can very easily give effect thereto by accepting only a bond which expressly obligates the surety to that end. Or, if the legislature so desires, it may by a mandatory statute provide as a matter of public policy that in all contracts with the state the payment of the just claims

of subcontractors who furnish labor and material shall be guaranteed by the surety on the contractor's bond. Since this case arose, some legislation of this nature has been enacted, and it is likely, as the complainant says, that another case identical with the instant case may not again arise in this state. Be that as it may, we do not feel justified in extending by judicial construction the scope and effect of a surety bond particularly one where, as in the instant case, we must go far afield to find the necessary operative language to read into the bond in order to broaden the obligation of the surety.

It has been further urged upon us that the definition of the word "Surety" given above from the "Standard Specifications" should be read into the condition of the bond. We cannot agree with this contention. It seems to us that thus defining the obligation of the surety is but another way of saying what language the bond shall contain and is not a declaration that it does contain such an obligation. Where the bond which was accepted did not bring the surety within the scope of the definition, it must be taken to be a waiver thereof by the obligee. To such a waiver the respondents have no right to object. Our attention has been called to the case of *Mason* v. *Portland Construction Co.*, 160 Atl. (N. H.) 477, where the court, in its opinion, after stating the definition of surety contained in the specifications, disregarded it completely in holding that the surety on the bond was not required to pay a subcontractor where there was no express obligation in the bond or contract on the part of either the contractor or the surety to pay for labor and materials. And on this point the court said: "According to the specifications the form of the 'contract bond required' was to be that provided by the city. If the city saw fit to provide a bond which failed to secure a benefit for third parties, the plaintiff, who is not a party to the contract, cannot complain." This case also holds that a promise of a contractor to furnish or provide labor and materials is not equivalent to a promise

to pay subcontractors with respect to the liability of the surety. The weight of authority supports this view, and we adopt it in answer to the respondents' contention that in the instant case the contractor's promise in the contract to furnish labor and materials raises an obligation in the surety to pay for them if the contractor fails to do so. See note 77 A. L. R. 101, and cases cited.

Therefore, even though the language of section 1.20 of the Standard Specifications were read into the contract, it would not, in our opinion, raise an obligation in the bond on the part of the surety to pay for labor and materials furnished, as therein specified.

We have not referred to all the authorities cited by the respondents nor to all those cited by the complainant, but have discussed these few cases as representative of them all. The conflict among them is sharp, and it seems to us to be due to a desire on the part of some courts to extend, wherever possible, the scope of public contract bonds by judicial construction in order to insure the payment of the just claims of those who have contributed labor or supplied materials in the construction of a public work. These courts have recognized the lack of a mechanic's lien on such contracts as creating an injustice, and they have thought to supply the void by a species of judicial legislation. They have also pointed out that a wise public policy requires that those supplying labor and materials in the construction of public works shall be guaranteed payment of their just claims. Strong and convincing arguments have been advanced in support of the position which they have taken and it is difficult to resist their persuasive force. But we must do so. We are not permitted to shape and mould our decisions to afford a means of protection to individuals engaged in business dealings where the law gives none. If there is a void, the legislature may fill it. Likewise it is for the legislature to say what shall be the public policy of the state in its contracts for public works. If injustice to subcontractors is possible now under such public contracts

doubtless the legislature will afford relief, and probably has already done so in the recently enacted chapter 2105, public laws 1934. That statute of course is not retroactive and, therefore, it is not necessary to consider it here.

Whether or not the above quoted language of the Standard Specifications is read into the bond and contract, our answer to question 1 is in the negative. It is, therefore, unnecessary for us to consider question 2.

Question 3 requires an answer as to the proper disposition of certain funds retained by the state board of public roads. These funds amount to $18,500, and represent earnings by the contractor on the three jobs in question. The state makes no claim to these funds on any of the jobs. The Newport avenue job was completed to the satisfaction of the state by the contractor and the other jobs were satisfactorily completed by the surety company.

We shall consider the Newport avenue job separately. We assume that the board can determine what portion of these retained funds were earned on this job. The contractor satisfactorily performed this contract. The surety therefore suffered no loss thereon. We have held above that this bond was a performance bond. On that holding the surety company is not in a position to make any valid claim to the funds earned on this job, especially when there are claims remaining unpaid for labor and material put into the job. The surety contends, however, that by virtue of an indemnity agreement entered into between it and the contractor at the time of the execution of the bond, it is entitled to the earned funds under an assignment contained in that agreement as follows: "(Sherry Construction Company, Inc.) 'Does hereby agree . . . second, to indemnify the company (Glens Falls Indemnity Company) against all loss, costs, damage, expenses and attorneys' fees whatever and any and all liability therefor sustained or incurred by the company by reason of executing of said bond or bonds or any statement . . . fourth, to assign, transfer and set over and does or do hereby assign, transfer

and set over to the company as collateral, to secure the obligations herein and any other indebtedness and liabilities of the undersigned to the company, whether heretofore or hereafter incurred . . . (d) *and all percentages retained on account of said contract, and any and all sums that may be due under said contract at the time of such abandonment, forfeiture, or breach, or that thereafter may become due."* (Italics ours.)

· We think that clause (d) thereof indicates quite clearly that this assignment is in contemplation of the surety being required to perform the contract, and that the agreement becomes operative only in such an event. In other words, it is just what it says it is, an indemnity agreement. The complainant calls our attention to the words, "to secure the obligations herein and any other indebtedness and liabilities of the undersigned" contained in the agreement, to show that it has a wider meaning than that above given. We do not so construe this language. The proper construction of the agreement can be had only by taking the instrument as a whole and giving such effect to the several clauses therein as will make of it what the parties thereto clearly intended, that is, an indemnity agreement. This is a bill in equity and the equitable rights of the parties are served by such a construction, rather than by a strict and narrow construction of some isolated clause in the agreement. Parties who have just claims for labor and materials actually put into this job remain unpaid. The surety suffered no loss because its principal performed his contract to the satisfaction of the state and thereupon the bond became void according to its terms. There appears to be funds in the hands of the state due the contractor on this job. We think that the equities of the case require that respondents claiming funds on this job should be paid and, as against them, the surety has no right to the funds.

The complainant cites one case only in support of its contention—*Lacy* v. *Maryland Casualty Co.,* 32 F. (2d) 48, (C. C. A., 1929, N. C.). It is significant that in that case

there was a default on the bonds and the surety completed both jobs. It is also important to note that the party claiming adversely to the surety was a bank which had loaned money to the contractor, not an unpaid laborer or materialman, as in the instant case. We think these facts sufficiently differentiate the two cases. If there had been a default on the Newport avenue job and the surety had been compelled to perform as in the *Lacy* case, *supra*, then it would be necessary for us to consider the indemnity agreement in a different light. We think also that the state could justly claim, if it cared to do so, that section 1.69 of the Standard Specifications controlled this particular job and could safely pay the claims of materialmen and laborers, if any. The state makes no claims to these funds and is prepared to follow the directions of the court. The complainant has come into equity for a determination of the matter. Equity will be done by such claims being paid out of the funds in the hands of the state earned by the contractor on this job.

The claim of the surety on the other two jobs presents an entirely different situation. Here the surety has performed under its bond and completed its principal's contract at a very substantial loss. Both under the indemnity agreement and by force of the well established principles of the law of subrogation the surety here has a right to the retained funds superior to all other claimants except the state, which is the obligee of the bond. The state is not claiming the fund, nor is it claiming to hold it in trust for any particular claimants. It is a simple custodian merely standing by awaiting directions from the court. As the obligee of the bonds, which we have held to be performance bonds, it had the right to use these funds to complete the jobs if the obligors of the bonds, both surety and principal, failed to perform their obligations.

The surety, performing the contracts, succeeds by subrogation to all the rights of the obligee. It has performed the contract at a substantial loss and is entitled to the

retained funds to the extent necessary to repair that loss. If these were bonds to pay for labor and materials, it would of course be required to make good such payments before it could claim the retained funds. But these are not such bonds. We have said that the contractor was not under any obligation with respect to the liability of the surety to pay such claims, and, therefore, no obligation to do so could be imputed to the surety. It is for this reason that the *Rhode Island Covering Company* case, *supra,* is not in point here.

The respondents, however, have cited to us *United States Fidelity & Guaranty Co.* v. *Marathon Lumber Co.,* 119 Miss. 802, and contend that it is almost identical with the instant case. In that case funds were retained under language somewhat similar to that of the specifications in the instant case, although the bond merely guaranteed performance of the contract and did not in so many words refer to payment of labor and materials. The court held in favor of the materialmen on the ground that the funds were impressed with a trust in their favor. We have carefully examined this case and think it is quite readily distinguishable from the instant case. There the court founded its decision on the holding that the surety company was obligated to pay for labor and materials by reason of language in the contract which it considered in connection with the specifications. Furthermore, the court laid considerable stress on the fact that the architect, acting for the Board of Trustees under and by virtue of the terms of the contract found that certain funds were due to the materialmen and were retained and set aside for that purpose. This was what enabled the court to declare a trust superior to the rights of the surety, the court saying, at page 826: "When the sums were deduced and set aside for the appellees by the architect as he was authorized to do, acting for the trustees under the contract, this constituted an exercise of the option by the trustees to retain the amount due appellee materialmen; and these funds became impressed with a trust . . ." Of

course there is no such situation here. The case, therefore, is not at all in point.

On the other hand, *St. Peter's Church* v. *Vannote*, 66 N. J. Eq. 78, 56 Atl. 1037, and *Tuttle* v. *Independent School Dist.*, 62 Ia. 422, 17 N. W. 603, cited by the complainant, are very close to the instant case on this point. Neither by the bond nor by statute was the surety in either of those cases under any obligation to pay for labor or material. The bond was in each case as we have held here, a performance bond to complete the work to the satisfaction of the obligee of the bond. "The general rule with respect to the right of the surety of a building contractor who completes the contract upon default by the contractor, to moneys in the hands of the contractee, earned by the contractor before default, is that upon completion of the contract the surety is entitled to be subrogated to the rights which the obligee had to, or could assert against, such funds upon the principal contractor's default to the extent necessary to reimburse itself for the outlay made to complete the contract." (Note 45 A. L. R. 380, and cases cited.) There is little, if any dissent in the cases on this point as appears from the thorough review of the authorities in the above note. The only limitation found in the cases is that the surety, upon completion of the abandoned contract, shall be entitled only to so much of the fund as shall reimburse it for its necessary expenditures in finishing the job. *Bank* v. *City Trust & Safety Deposit Surety Co.*, 52 C. C. A. 313, 114 Fed. 529; *Union Stone Co.* v. *Hudson County*, 71 N. J. Eq. 657, 65 Atl. 466. This is a proper limitation consonant with the reason underlying the application of the equitable doctrine of subrogation, and with our opinion.

We think it unnecessary to further prolong this opinion by considering the assignment in the indemnity agreement as in our view the surety's right to these funds by subrogation is decisive of the point raised. We, therefore, answer question 3 as certified in the negative as to funds retained on the Newport avenue job, and in the affirmative

as to the Danielson Pike job and the Main street job, to the extent necessary to reimburse said surety for its proper expenditures in completing said jobs.

The papers in .the cause, with our decision certified thereon, are ordered to be sent back to the superior court for further proceedings.

*George Paul Slade, Paul R. McIntyre, Greenough, Lyman & Cross, Fred B. Perkins, McGovern & Slattery,* for complainants.

*Francis I. McCanna, Edward M. McEntee,* for Standard Oil Co. of New York.

*John J. Cooney, Asst. Attorney General,* for State.

*Walter I. Sundlun, Baker & Spicer, Moss, Haslam & Arnold, Charles R. Haslam, Harry A. Tuell, A. Truman Patterson, Roger L. McCarthy,* for various respondents.