DECISION
Appeal from the Warwick Probate Court, No. 2004-471.
Before this Court is an appeal from an order of the Warwick Probate Court admitting to probate the Last Will and Testament of Ann Marie Picillo. This Court is called upon to settle a long legal struggle between Ms. Picillo's caregiver and her longtime friend, the two beneficiaries under her will, and her nieces and nephews who seek to invalidate the will. If this case stands for any proposition, it is that "death ends a life, not a relationship."[1]
 I FACTS AND TRAVEL
The following is a brief outline of the undisputed facts that came to light during the course of the trial. Additional facts will be detailed below as they become relevant to the issues discussed. *Page 2 
Ms. Picillo executed a document purporting to be her Last Will and Testament on November 11, 2004. By this time she was already frail and was receiving in-home hospice care. She was also being cared for by a caregiver who Ms. Picillo directly employed, Cristina Castellanos. The two had met in March of 2003 while Ms. Picillo was hospitalized. At that time Ms. Castellanos was employed by the hospital as a nurse's assistant and Ms. Picillo was under her care. Ms. Picillo later asked Ms. Castellanos to work as her in-home caregiver, and they soon began an employee/employer and patient/caregiver relationship. During the late morning of November 11, 2004, Ms. Picillo was visited by a hospice nurse. The nurse made various observations and recorded them on a sheet entitled "Home Hospice Care of Rhode Island." The nurse's records indicate that Ms. Picillo had been given three doses of morphine in the previous twenty-four hours. Records from the previous day, November 10, 2004, similarly indicate that Ms. Picillo had received two doses of morphine in the previous twenty-four hours. Uncontradicted testimony was later offered at trial to demonstrate that the hospice nurses relied on Ms. Picillo's home caregivers to inform them of any medications that she had previously taken. This is because the hospice nurses were not always present with Ms. Picillo. According to their own records they visited one to three times per week. Thus, in order to properly document the amounts and types of medications Ms. Picillo had received, they would rely on her caregivers, and they would also observe any empty or used medication packaging, such as morphine syringes.
Anxious to complete her will on November 11, 2004, and unable to contact her regular attorney, Ms. Picillo summoned a new attorney, Erin Illuzzi, to her home. Attorney Illuzzi had been recommended to Ms. Picillo that day by her hospice nurse Jane *Page 3 
Illuzzi, who was Attorney Illuzzi's mother-in-law. She arrived around 2:00 p.m. Also present were Ms. Castellanos and Diane Monroe, a former neighbor and friend of Ms. Picillo. While their meeting began promisingly, Attorney Illuzzi ultimately decided against preparing Ms. Picillo's will, citing concerns about testamentary capacity, as well as the possible undue influence of the two other women. Attorney Illuzzi left without executing Ms. Picillo's will.
After Attorney Illuzzi's departure, a handwritten list was completed by Ms. Castellanos and Ms. Monroe, detailing the property Ms. Picillo owned and the person or people she wanted to leave it to in her will. Ms. Castellanos testified that they wrote the list at Ms. Picillo's direction, and in doing so, exerted no influence over Ms. Picillo. Later that evening, Ms. Picillo was able to contact Attorney Richard Walsh, an attorney with whom she had a longstanding relationship, and with whom she had completed various draft wills. Attorney Walsh arrived that evening around 6:00 p.m., met privately with Ms. Picillo, then left to prepare her will. He returned to execute the will later that evening around 8:00 p.m.
Ms. Picillo died in her home on November 21, 2004. Her nieces and nephews now seek to invalidate her will, alleging a lack of testamentary capacity as well as undue influence on the parts of Ms. Castellanos and Ms. Monroe. For purposes of clarity, this Court will refer to the nieces and nephews collectively as the Opponents of the Will.
 II STANDARD OF REVIEW
"Any person aggrieved by an order or decree of a probate court . . . may, unless provisions be made to the contrary, appeal to the superior court for the county in which *Page 4 
the probate court is established . . ." R.I.G.L. § 33-23-1(a). Such an appeal "is to be heard de novo in the superior court."Id. Because this trial was held without a jury, this Court looks to Rule 52(a) of the Rules of Civil Procedure, which states "[i]n all actions tried upon the facts without a jury . . . the court shall find the facts specially and state separately its conclusions of law thereon . . ." "It is important to note that `[t]he trial justice need not engage in extensive analysis to comply with this requirement.'" Nardone v. Ritacco,936 A.2d 200, 206 (R.I. 2007) (quoting White v. LeClerc,468 A.2d 289, 290 (R.I. 1983)).
 III DISCUSSION A Testamentary Capacity
The Opponents allege that at the time of the will's execution, Ms. Picillo lacked testamentary capacity, thus rendering the purported will invalid. "It is well-settled that in a will contest, the proponent of the will bears the burden of proof of testamentary capacity by a fair preponderance of the evidence." Pollard v.Hastings, 862 A.2d 770, 777 (R.I. 2004) (citing Nelson v.Blake, 713 A. 625, 626 (R.I. 1934)). The equally well-settled test for testamentary capacity requires that, at the time of the will's execution, the testator:
 "[1] has sufficient mind and memory to understand the nature of the business he is engaged in when making his will[; 2] has a recollection of the property he wishes to dispose of thereby[; 3] knows and recalls the natural objects of his bounty, their deserts with reference to their conduct and treatment of him, [and] their necessities[;] and [4] the manner in which he wishes to distribute his property among them." Id. (quoting Rynn v. Rynn, 55 R.I. 301, 321, 181 A. 289, 294 (1935)). *Page 5 
To carry their burden of proving testamentary capacity, Ms. Castellanos relied primarily on testimony from Attorney Richard Walsh. Attorney Walsh had been Ms. Picillo's attorney since 1986, having represented her in a variety of matters. Beginning in 2003, Ms. Picillo began meeting with Attorney Walsh regarding her will. Prior to the execution of the will in question, Attorney Walsh had met with Ms. Picillo on October 18, 2004. Attorney Walsh testified that on that date, while Ms. Picillo had no difficulty speaking or conveying ideas, she was still uncertain about who she would designate as the beneficiaries under her will. However, according to Attorney Walsh, one thing was clear in her mind — her nieces and nephews would receive nothing under her will. In fact, on various occasions during her meetings with Attorney Walsh, she made her strong negative feelings for her nieces and nephews known, calling them `sons of bitches' and `bastards,' while remaining consistently adamant that they were to receive no part of her estate.
On November 10, 2004, Ms. Picillo attempted to schedule an appointment for the following day with Attorney Walsh to finalize her will. Attorney Walsh testified that Ms. Picillo had contacted him to set up the appointment because she had made up her mind about who would be the beneficiaries of her estate. Because November 11, 2004 was a holiday — Veterans' Day — Attorney Walsh told her that he would be unavailable to execute her will that day, and scheduled an appointment for a later date. However, after tending to some yardwork at home on the 11th, Attorney Walsh realized that Ms. Picillo had been trying to reach him throughout the day. He testified that he then spoke with her on the phone, and she clearly and intelligibly asked him to come to her home, where she *Page 6 
was receiving hospice care. Attorney Walsh agreed, arriving at the home around 6:00 p.m.
Upon arriving, there were other people present in the home; specifically, Cristina Castellanos, Diane Monroe, and another unidentified individual. At this time, Attorney Walsh had no knowledge that Attorney Illuzzi had been to Ms. Picillo's home earlier that day and had refused to prepare her will. This series of events will be addressed by this Court later in this decision.
Attorney Walsh asked the others to leave the room so that he and Ms. Picillo could discuss her will. Attorney Walsh testified that it is his practice to meet privately with a testator previous to the execution of the will to ensure that the testamentary disposition is what the person truly wants. The two spoke privately for twenty to thirty minutes. Attorney Walsh testified that during this time Ms. Picillo was mentally alert and awake, similar to all the other meetings the pair had had; that "she was the same old Ann Picillo," despite looking physically tired. The Court notes that Attorney Walsh had two or three dozen meetings with Ms. Picillo between 1986 and 2004, during which time he represented her in a variety of matters. He testified that at this point, without any prompting, Ms. Picillo asked him if he had received the sheet of paper with handwritten notes on it. Attorney Walsh quotes Ms. Picillo as stating `let's see if they got it right.' According to Attorney Walsh, while he held this paper Ms. Picillo recited the contents of the list to him, without referring to it at any time. Ms. Picillo's recitation of the list was "absolutely consistent with everything on that document." In fact, Ms. Picillo even had the presence of mind to note that there was one account not on the handwritten list, and addressed it in her residuary clause. Attorney Walsh testified that she also had an *Page 7 
approximate idea of how much money was in each of her bank accounts, and discussed the reasons for her dispositions. Attorney Walsh testified that during their meeting, Ms. Picillo told him that she and Ms. Castellanos had grown very close over the preceding eighteen months, that Ms. Castellanos provided her with great care, and that she believed she would already be dead without the care provided by her and her two sons. According to Attorney Walsh, Ms. Picillo was concerned about Ms. Castellanos's ability to support herself after she passed away. Although previous drafts of her will had created charitable trusts for animals, Ms. Picillo's testamentary intent had changed. Her primary concern was for Ms. Castellanos and her two sons on November 11, 2004.
After their private meeting, at approximately 6:30 p.m., Attorney Walsh left Ms. Picillo's home to go to his office to write the will. Upon his return at approximately 8:00 p.m., Attorney Walsh found Ms. Picillo still tired, but not deteriorated physically. He brought three witnesses to the execution of this will — his mother and father, and Stephen Pagnano, a commercial tenant in a building he owned. Attorney Walsh testified that Ms. Picillo stated she would sign the will "if everything was right." She asked Attorney Walsh to read the will aloud, and insisted that the other people in the house remain present to hear what was in the will. As he did so, Ms. Picillo would sometimes interrupt to clarify that the right account was going to a particular person, identifying the account not by the bank or account number, but by its approximate value. Her last question before signing was to confirm that the will left nothing to her nieces and nephews. Attorney Walsh then asked her if the will was her own free act; during the entire time he was present no one made any suggestions to Ms. Picillo about any bequests. Despite the fact that Ms. Picillo's hands were crippled from rheumatoid arthritis, she insisted on *Page 8 
signing the will herself. During direct examination, Attorney Walsh gave his opinion that at the time of the execution of her will, Ms. Picillo had testamentary capacity. This assessment of her on November 11, 2004 was reinforced by his observations of her the next day. Attorney Walsh testified that on November 12, 2004 Ms. Picillo's condition was greatly improved — she was less tired and more lively, but no more or less sharp than on the previous day.
Attorney Walsh testified that when signing her will, Ms. Picillo was coherent in her speaking and understanding. This observation was corroborated by Mrs. Walsh and Mr. Pagnano, witnesses to the will's execution. By the time of the trial, only Mrs. Walsh and Mr. Pagnano were available to testify, as Mr. Walsh, the third witness, had passed away. Neither of the witnesses had ever met Ms. Picillo before. Mr. Pagnano testified that Ms. Picillo was stern and emphatic that she receive a copy of the will, and described her as `spunky.' Mrs. Walsh testified that Ms. Picillo did not seem tired or confused, and did not appear to be medicated; that she appeared alert. Both witnesses testified that Attorney Walsh read the will aloud in her presence, and Ms. Picillo acknowledged the portions read aloud to her. Both witnesses testified that at no time did any of the other people present in the house pressure Ms. Picillo about her will.
The Opponents of the will offered the testimony of Erin Illuzzi to support their position that Ms. Picillo lacked testamentary capacity when she attempted to execute her will earlier in the day on November 11, 2004. Attorney Illuzzi's mother-in-law, Jane Illuzzi worked as a hospice nurse in Ms. Picillo's home. On November 11, 2004, Ms. Picillo expressed a strong desire to execute her will, and when she was unable to reach Attorney Walsh, Jane Illuzzi offered to contact her daughter-in-law. She did so, and *Page 9 
Attorney Illuzzi was summoned to Ms. Picillo's home, arriving at approximately 2:00 p.m. with Hillary Sullivan, a paralegal in her office. At that time, Attorney Illuzzi had been a Rhode Island attorney for approximately thirteen months, and had done no more than six wills, consisting of form wills from her office, and all executed in her office. Ms. Castellanos was present when she arrived, as was a third unidentified woman. At no time during her meeting with Ms. Picillo did she ask any of the people present to leave the room. Attorney Illuzzi testified that upon her arrival, Ms. Picillo was able to understand her; she was able to answer her questions appropriately; and she did not appear to be on any sort of medication. She worked off of a draft will that she obtained from someone in the house. Consistent with her declarations to Attorney Walsh, Ms. Picillo also communicated to Attorney Illuzzi that she did not care for her nieces and nephews, and she wished to exclude them from her will because they were `good for nothing.'
After about ninety minutes of meeting with Ms. Picillo and trying to formulate and execute her will, Attorney Illuzzi testified that Ms. Picillo became increasingly tired, she began to `fade,' and she was unable to hold her attention for long or complex questions. At this point, Attorney Illuzzi began to have doubts about Ms. Picillo's ability to execute a will. Furthermore, Attorney Illuzzi testified that at this point, Ms. Castellanos and Ms. Monroe began reminding Ms. Picillo of specific devises that she had apparently told them they would receive. Attorney Illuzzi described it as both women saying "Don't you remember you were going to give me this?" or "Don't you remember you were going to leave me that." She testified that, not knowing the relationship dynamics between the people in the room, and not knowing Ms. Picillo beyond the *Page 10 
approximately three hours during which they met, she did not feel comfortable in continuing to prepare her will. Attorney Illuzzi testified that upon her departure, she did not feel that Ms. Picillo had testamentary capacity. She further testified that Ms. Picillo reacted very unfavorably to the news that her will would not be completed that day.
The Opponents of the will also offered the testimony of Hillary Sullivan, the paralegal who went to Ms. Picillo's home with Attorney Illuzzi. Her testimony was offered in the form of a video deposition, as Ms. Sullivan now lives outside of Rhode Island. Ms. Sullivan offered a somewhat different view of her meeting with Ms. Picillo. From the outset, it was apparent to Ms. Sullivan that Ms. Picillo was `on some kind of morphine.' Ms. Sullivan testified that almost immediately upon arriving, Ms. Picillo was tired and not aware of her surroundings; that Attorney Illuzzi began with preliminary questions, asking Ms. Picillo her name, or the day of the week, and she was unable to respond properly. Throughout the course of their meeting, Ms. Picillo was in `a fog, or a daydream.' Ms. Sullivan testified that very soon after their arrival, Ms. Castellanos and Ms. Monroe began speaking for Ms. Picillo, who was unable to comprehend what was happening around her. When Attorney Illuzzi told Ms. Picillo that she would be unable to complete her will that day, Ms. Picillo offered no reaction.
The Opponents also offered the testimony of Dr. James Burrill to support their position that Ms. Picillo lacked testamentary capacity when she executed her will. Dr. Burrill is Board certified in geriatrics and internal medicine, and sub-specializes in geriatric pharmacology, which Dr. Burrill defined as "the subset of pharmacology in general that talks about the absorption, direction, metabolism and elimination of drugs in [the] elderly." While Dr. Burrill did not meet or examine Ms. Picillo, he conducted a *Page 11 
thorough review of her medical history, including her hospice records. Dr. Burrill noted that Ms. Picillo suffered from hyperparathyroidism, which causes high levels of calcium in a person's blood. Hyperparathyroidism is a condition that worsens with time, and can cause a waxing and waning level of consciousness. He also indicated that Ms. Picillo suffered from cachexia, which he described as a condition of being `wasted' or emaciated from a variety of chronic illnesses. Dr. Burrill's testimony centered mainly on the hospice records of November 11, 2004, which indicated that Ms. Picillo had received three doses of morphine in the twenty-four hours prior to 12:45 p.m. Dr. Burrill testified that based on Ms. Picillo's comorbidities (comorbidities are the sum total of disease processes and their impact on a patient's function), the morphine would still be exerting a positive pharmacological effect on Ms. Picillo "at five, six, seven o'clock that night." Dr. Burrill was shown deposition testimony of Attorney Richard Walsh, Hillary Sullivan, Attorney Erin Illuzzi and Jane Illuzzi, as well as a transcript of Attorney Illuzzi's testimony in court. In light of this testimony, as well as the hospice records that described Ms. Picillo as being `alert and oriented' in one area and `lethargic' in another, Dr. Burrill concluded that Ms. Picillo was in a state of delirium, which he defined as "waxing and waning in [one's] level of consciousness and mental status." Dr. Burrill stated that, based upon Ms. Picillo's condition earlier in the day when she had met with Attorney Illuzzi, as well as her comorbidities and the fact that she had received multiple doses of morphine in the previous twenty-four hours, Ms. Picillo did not have testamentary capacity at the time she signed her will.
On this issue of testamentary capacity, this Court finds the testimony of Attorney Walsh credible in its entirety. As of November 11, 2004, Attorney Walsh was an *Page 12 
attorney with twenty-four years of experience, and had completed upwards of two hundred wills. He had a long history of representing Ms. Picillo in a variety of matters, having met with her approximately thirty times. During the course of their professional relationship, Attorney Walsh was able to get a sense of Ms. Picillo's personality, which he described as `independent,' and `feisty;' he described her as `sharp as a tack,' and a person in control of her own destiny. On the day of the will's execution, he was able to observe Ms. Picillo through the lens of their longstanding relationship, and in light of his extensive experience in estate planning. As to the notation on the hospice records that Ms. Picillo had received morphine in the previous twenty-four hours, this Court finds credible the testimony of Diane Monroe, who stated that she and Ms. Castellanos habitually lied about the amount of morphine Ms. Picillo had been receiving. Ms. Monroe's stated reason for so doing was that a hospice nurse had told her that if Ms. Picillo did not take morphine in her home, they would be forced to take her out of her home and into a hospice facility. Both Ms. Monroe and Ms. Castellanos confirmed that Ms. Picillo did not want to take morphine, and that she had a strong, overarching desire to remain in her own home while she died. The testimony of Jane Illuzzi, Ms. Picillo's hospice nurse, also corroborated the fact that Ms. Picillo had historically refused to take morphine, despite the fact that her pain was becoming an issue.
Dr. Burrill was very well-qualified and offered insightful and clear testimony. However, his testimony was based in large part on the presumption that Ms. Picillo had taken multiple doses of morphine some time prior to executing her will. Dr. Burrill then detailed the pharmacological effect such medication would have on a person like Ms. Picillo. His testimony was based exclusively on hospice records and accounts from other *Page 13 
witnesses, who themselves were without knowledge as to whether Ms. Picillo had taken morphine. This Court simply gives more weight to the testimony of Attorney Walsh, who was experienced in will executions, and who was able to observe Ms. Picillo contemporaneously to the signing of her will, and whose testimony was corroborated by other contemporaneous witnesses. (SeePollard, 862 A.2d at 775-76 (placing less weight on the testimony of an expert witness doctor who had never examined or even met the testator)). Additionally, Ms. Monroe's testimony that she and Ms. Castellanos intentionally misrepresented the administering of morphine, coupled with Ms. Picillo's stated desire to not take morphine, persuade this Court that Ms. Picillo had not received morphine in the relevant time period before she executed her will.
This is not to say that Attorney Walsh's testimony and Dr. Burrill's testimony are necessarily mutually exclusive. Even if Ms. Picillo had taken morphine at some point during the previous day, the testimony of Attorney Walsh and of the witnesses to the will's execution convince this Court by a fair preponderance of the evidence that Ms. Picillo had testamentary capacity at the time she signed her will. "A will executed in a lucid interval by one who was before and afterward confirmed mentally impaired or under delusions is valid." 79 Am. Jur. 2d Wills § 89 (2002). Therefore, the factual issue of whether Ms. Picillo took morphine during the twenty-four hours leading up to the execution of her will is only material to the extent that it makes it more or less likely for her to have had testamentary capacity when she executed her will. The hospice records, even if they did accurately reflect the amount of medicine Ms. Picillo had taken, are merely circumstantial
evidence of her testamentary capacity. This Court has substantial and unbiased direct evidence — the observations of Attorney Walsh, Mrs. Walsh and Mr. *Page 14 
Pagnano — to support the conclusion that Ms. Picillo did indeed have testamentary capacity at the time she executed her will.
Finally, Ms. Picillo's final dispositions are consistent with her previous declarations of intent. As will be discussed below, Ms. Picillo made various intimations and overt declarations regarding how she intended to distribute her property upon her death. "That a will is such as might have naturally been expected from a testatrix so situated, and is consistent with her affections and previous declarations, is strong evidence of testamentary capacity." 79 Am. Jur. 2d Wills 140 (2002).
 B Undue Influence
Having addressed the issue of testamentary capacity, this Court will now proceed to the issue of undue influence. In undertaking this analysis, the relationships between the parties become relevant to explain the reasons for what may seem to some to be an unusual or unexpected disposition. To the extent that it was helpful to this Court sitting as the finder of fact, some of the testimony regarding the relationships Ms. Picillo had formed during her life will be outlined below.
"Undue influence may be simply defined as the substitution of the will of a third party for the free will and choice of the testator in making a testamentary disposition." Caranci v. Howard,708 A.2d 1321, 1324 (R.I. 1998). "The party contesting the will must prove undue influence by a preponderance of the evidence."Id. (citing Murphy v. O'Neil,454 A.2d 248, 250 (R.I. 1983)). Because such coercion is usually done in secret, a challenger asserting undue influence often must rely on circumstantial evidence to carry his or her burden.Id. An unnatural or unexplained disposition may give rise to an inference of undue influence. Id. "[E]vidence that the person accused of unduly *Page 15 
influencing the testator enjoys a relationship of trust and confidence with the testator and was instrumental in the testator's execution of the contested will may at least give rise to the drawing of a permissible inference that undue influence was exerted on the testator." Id. The presumption is not automatic, however, and it is certainly rebuttable — "When one puts forth sufficient evidence to raise an inference, and the other party offers no contrary proof, the nonofferor is not entitled to the direction of a verdict in his favor; the court, instead, will permit the issue to be decided by the jury." Murphy, 454 A.2d at 250. The factfinder may then find in the offeror's favor, "even though it is not required to do so." Id.
In the instant case, it is undisputed that both Ms. Castellanos and Ms. Monroe were present during some of Ms. Picillo's meetings with her attorneys on November 11, 2004, as well as the during execution of the will. It is also undisputed that during Attorney Illuzzi's earlier visit, Ms. Castellanos presented Ms. Picillo with some financial documents. The dispute arises as to whether Ms. Castellanos retrieved those papers at Ms. Picillo's behest, as well as to how aggressively Ms. Castellanos presented Ms. Picillo with the papers. As this Court has previously noted in its decision inLarmore v. Fleet National Bank, "not all influence is undue."2006 WL 3293936, *7. Undue influence will serve to invalidate a will only if it is "the substitution of the will of a third party for the free will and choice of the testator." Caranci,708 A.2d at 1324. Due to the nature of the claim of undue influence, this Court must explore the relationships that Ms. Picillo had developed throughout her lifetime. The nature and depth of those relationships may or may not help to explain what may seem to many to be an "unexplained, unnatural disposition," — specifically Ms. Picillo leaving the bulk of her estate to a home caregiver *Page 16 
she had only known for eighteen months, while disinheriting her only living family members. Id.
To begin, Attorney Walsh offered insight into Ms. Picillo's personality, which tended to demonstrate her lack of susceptibility to undue influence. See Notarantonio v. Notarantonio,941 A.2d 138, 147 (R.I. 2008). A specific story recounted by Attorney Walsh serves to summarize the rest of the testimony regarding Ms. Picillo's strength of character. Attorney Walsh recounted an incident from the early months of 2004, during which time Ms. Picillo was attempting to have some tenants evicted from a rental property that she owned. Her health had been in decline up to that point, and she was confined to a hospital bed. Despite being bedridden, Ms. Picillo insisted on coming to court to testify against her tenants, refusing to let them take advantage of her illness. She was taken to court on a gurney in an ambulance and successfully had her tenants evicted. This story was indicative of descriptions provided by numerous witnesses who attested to Ms. Picillo's tough and sometimes domineering personality. Attorney Walsh described her personality as one that liked to be in control, who wanted things her way. He described the relationship between Ms. Picillo and Ms. Castellanos as strictly an employer/employee relationship, with Ms. Castellanos acting solely at Ms. Picillo's direction.
Ms. Castellanos supported this characterization with much of her own testimony — she detailed Ms. Picillo's initial persistence that she come and care for her in the first place, and the gradual increase in the demands of her new boss. Ms. Picillo even insisted that Ms. Castellanos move into one of her apartments, so that she could be close by to provide care, and so that Ms. Castellanos's two sons would be able to take advantage of *Page 17 
living in a better school district. Ms. Castellanos described Ms. Picillo's ire when she would purchase the wrong items at the grocery store. She testified that Ms. Picillo was a strong person; that she wanted things done her way and done immediately, otherwise she would become agitated, turning red and yelling. According to Ms. Castellanos, Ms. Picillo even controlled their conversations, generally being the one to initiate them and doing most of the talking. Ms. Picillo dictated what they would eat, when, and how it would be prepared. At least up until the time of her testimony, Ms. Castellanos was able to recite without hesitation Ms. Picillo's favorite snacks, how she liked her coffee prepared, and her tomato sauce recipe. When she was asked whether she always did what Ms. Picillo asked her to do, Ms. Castellanos responded in earnest "Yes . . . because it was my job." This Court finds credible the uncontradicted testimony that Ms. Castellanos acted only at the behest of Ms. Picillo in all matters relating to her employment.
The testimony elicited at trial portrayed Ms. Picillo's relationship with Ms. Castellanos as one that was born of necessity and steadily progressed into one of mutual affection. While most of the testimony in this area came from Ms. Castellanos (an interested witness) herself, this Court finds such testimony to be reliable based on Ms. Castellanos's frank and forthright demeanor while testifying. Additionally, every witness who had any significant personal contact with Ms. Picillo offered corroborative testimony relating to the warmth and depth of the relationship between her and Ms. Castellanos. Attorney Walsh testified that Ms. Picillo would, without being prompted, praise Ms. Castellanos, and exhibit concern for her and her sons' well-being. Attorney Walsh testified that Ms. Picillo told him that without Ms. Castellanos's care, she would certainly *Page 18 
be in a nursing home — an arrangement to which Ms. Picillo was vehemently opposed. Jane Illuzzi testified that Ms. Picillo loved Ms. Castellanos, that Ms. Picillo wanted Ms. Castellanos to receive her assets upon her death, and that Ms. Picillo volunteered this information unsolicited. Diane Monroe testified that Ms. Picillo raved to her about Ms. Castellanos and the quality of care she provided for her, and stated that Ms. Castellanos was like the daughter she never had.
Ms. Castellanos first met Ms. Picillo in March of 2003 working as a nursing assistant where Ms. Picillo was hospitalized. In June of 2003, Ms. Picillo obtained Ms. Castellanos's telephone number from a hospital employee and called her to offer employment. While Ms. Castellanos initially resisted, in July she agreed to care for Ms. Picillo on Tuesdays. Ms. Picillo asked her to increase her time commitment, being dissatisfied with her other caregivers. She even convinced Ms. Castellanos to move into one of the apartments she owned, so that she could be closer to her to provide care, and so that her two sons would be able to attend what she considered a better school. As Ms. Castellanos and her children moved closer to Ms. Picillo's home, they also moved closer to her heart. Ms. Picillo sent Ms. Castellanos's children to summer camp in 2003 and 2004, concerned that idle hands are the devil's playground. An animal lover, Ms. Picillo bought a dog for the Castellanos family. Once Ms. Castellanos was caring for Ms. Picillo fulltime, the four of them would have dinner together every weeknight and movie nights on Fridays, complete with popcorn. She would fondly refer to the two boys as "her fellows," liberally showering them with hugs. Ms. Picillo indicated to Ms. Castellanos (and separately to Attorney Walsh, prior to the execution of her will) that Ms. Castellanos would not have to worry about a place to live or for money for her children to attend *Page 19 
college. The testimony adduced at trial corroborated this affectionate relationship between Ms. Picillo and Ms. Castellanos. Here this Court pauses to note Ms. Picillo's physical condition. Her hands were deformed by rheumatoid arthritis, always balled up into curled fists. She had only one leg, the other having been amputated during a prior hospitalization. To use Dr. Burrill's words she was cachexic, with various witnesses estimating her weight to be less than one hundred pounds. A photo of Ms. Picillo taken in the months prior to her death and entered into evidence at trial indicates that her skin had taken on a pale gray, shiny complexion. One may logically expect an emotional attachment to develop between a physically dependant patient and her fulltime caregiver; however it is a testament to the strength of their relationship that Ms. Castellanos gratuitously shared her children with Ms. Picillo, and that the children were so receptive to this frail and gravely ill addition to their family.
While Ms. Picillo was strong-willed and always made the decisions in their relationship, she showed a certain affection for Ms. Castellanos, singing her praises to anyone who would listen, and expressing concern for her ability to support herself after their relationship would end. Ms. Castellanos testified about her abject sadness upon Ms. Picillo telling her that she would not be getting any better and that she would be entering hospice to die. Ms. Castellanos was so moved upon hearing the news (and upon relaying it at trial) that she became emotional and had to be consoled. Two weeks before her death, Ms. Picillo asked Ms. Castellanos and her children to start spending the nights at her home because she was afraid to die alone. Ms. Castellanos and her boys obliged, the four of them sleeping in the same room together. On November 21st, 2004, Ms. Picillo may have sensed that she would soon pass away, and asked to speak to Ms. Castellanos's *Page 20 
children. She told them to be good, to behave and to do their chores. She asked Ms. Castellanos to play a certain song for her, "Never on Sunday[2]," and to dye her hair because she didn't want God to see her with white hair. Upon doing so she and a neighbor prayed over Ms. Picillo as she slowly passed away. Ms. Castellanos then washed her and changed her into an outfit Ms. Picillo had chosen for this day. While she recounted the day Ms. Picillo passed away, Ms. Castellanos was visibly shaken and moved to tears. Her demeanor during this testimony, as well as her emotional reaction to seeing a photo of Ms. Picillo and the testimony from other witnesses recounting Ms. Picillo's praise for Ms. Castellanos, indicate to this Court that there existed a true and sincere caring relationship between them, and that their emotional attachment to one another went beyond the bounds of their employer/employee relationship.
Ms. Castellanos's testimony regarding the depth of her relationship with Ms. Picillo was corroborated by Attorney Walsh, Jane Illuzzi and Diane Monroe. Ms. Picillo offered to Jane Illuzzi, unsolicited and unprompted, that she loved Ms. Castellanos and that she wanted her to receive all of her assets after her death, because Ms. Picillo's own family had abandoned her and she did not want to leave anything to them. Diane Monroe candidly testified that Ms. Picillo often raved about Ms. Castellanos to her; to the point that Ms. Monroe became jealous of their relationship. Ms. Picillo even went as far as to call her `the daughter she never had.' Attorney Walsh recounted a similar conversation, in which Ms. Picillo (again unsolicited) praised Ms. Castellanos and expressed her concern for her and her sons' wellbeing and their ability to support themselves. *Page 21 
As compared to Ms. Castellanos's relatively short relationship with Ms. Picillo, Diane Monroe had a long relationship with her that began when they were across-the-street neighbors in the 1980s. Mr. Monroe testified that she maintained a "very close" relationship with Ms. Picillo up to the time of her death, and Ms. Picillo was considered "like family." She also stated that on several occasions going back as far as 15 years ago, Ms. Picillo expressed her feelings towards Ms. Monroe in volunteering comments that she intended to leave everything to her upon her death. One final and significant act of kindness and generosity by Ms. Picillo, just prior to her death, was a gift of jewelry offered to Ms. Monroe and her daughter, Kirsten.
In stark contrast stand the relationships Ms. Picillo had with her nieces and nephews, the natural objects of her bounty as her next of kin. Attorney Walsh and Jane Illuzzi both testified that Ms. Picillo held nothing but animosity towards her family, on various occasions calling them "good for nothing" "bastards," and "sons of bitches." While the reasons for Ms. Picillo's intense animosity towards her entire family are not entirely clear, this Court is satisfied that Ms. Picillo intended to keep them out of her will. Attorney Walsh testified that on more than one occasion Ms. Picillo expressed to him her desire to keep her nieces and nephews out of her will. In fact, both before and after signing her will, Ms. Picillo asked Attorney Walsh to confirm that he was sure the will provided that her nieces and nephews would receive nothing. When Attorney Walsh returned the next day, Ms. Picillo again asked him, and even made him promise, that her family would receive nothing in her will. Ms. Castellanos testified that Ms. Picillo did not even want them notified of her death to prevent their presence at her funeral, for fear that they would meddle with her testamentary plan. *Page 22 
While they may not entirely explain Ms. Picillo's antipathy towards her entire family or the origins of those feelings, two incidents recounted by Ms. Castellanos were particularly enlightening to this Court. The first incident occurred when her nephew Michael was living with her. Despite living in her home and despite the fact that Ms. Picillo would ask him for food in the morning, Michael did not feed her and Ms. Picillo had to call on a friend Judy to stop by every morning to make her coffee and occasionally pancakes. Even more egregious was the incident surrounding Ms. Picillo's niece named Beatrice. Beatrice, too, at one point lived with Ms. Picillo. Beatrice left Ms. Picillo's home one Friday night, and did not return for the entire weekend, leaving the immobile Ms. Picillo without any food, and without any means to move about the house. When she finally called a cousin on Sunday to come and tend to her, she had already been sitting in her own waste and was so famished that she insisted upon being fed before being cleaned. Furthermore, Ms. Picillo had a poor relationship with her four brothers all of whom predeceased her. Ms. Picillo believed her brothers resented her because she had received the bulk of their parents' inheritance. The aforementioned uncontradicted testimony adduced at trial thus removes the specter of an unnatural, unexplained disposition and disinclines this Court to make any inference of undue influence. Caranci,708 A.2d at 1324.
The Opponents of the will also point to Ms. Castellanos and Ms. Monroe standing over Ms. Picillo during her initial meeting with Attorney Illuzzi and reminding or encouraging her to remember certain dispositions, as evidence of undue influence. However, this Court finds that such actions do not rise to the level of these women substituting their own will for that of Ms. Picillo. The Court notes that there was *Page 23 
testimony elicited at trial that Ms. Picillo had already committed to making those dispositions to Ms. Castellanos and Ms. Monroe. Thus, they could not have substituted their will for her own, as it was already her intention to make those dispositions. Furthermore, the time at which that influence was allegedly exerted is not sufficiently proximate to the execution of the will, and facts and circumstances that transpired in the meantime dissuade this Court from making any inference of undue influence based on the women's physical proximity to Ms. Picillo during her meeting with Attorney Illuzzi. Attorney Walsh met with Ms. Picillo in private, and ensured that the dispositions she was making were of her own free will.
The Opponents of the will also point to the handwritten list prepared by Ms. Castellanos and Ms. Monroe as evidence of undue influence. However, this Court finds that such list was prepared at Ms. Picillo's direction in the time between her meetings with Attorney Illuzzi and Attorney Walsh, and that such list represents her own free will and testamentary intent. First, the list is consistent with her previous declarations of intent. 79 Am. Jur. 2d Wills § 140 (2002). Second, when Attorney Walsh arrived to go over the list with Ms. Picillo, she stated "let's see if they got it right." That statement indicates to this Court that Ms. Picillo had a certain testamentary disposition in mind, and wanted to insure for herself that the list she dictated to Ms. Castellanos and Ms. Monroe was consistent with that intent. Finally, Ms. Picillo was able to recite the list back to Attorney Walsh without looking to it for reference. Such a recitation indicates to this Court not only that Ms. Picillo had the presence of mind and capacity to remember the nature and extent of her property and the parties to whom she desired to leave that *Page 24 
property, but also that the list represents her true testamentary intent, as she was able to recite it to Attorney Walsh in a private setting.
 IV CONCLUSION
A review of the testimony presented at trial indicates that Ms. Picillo had testamentary capacity at the time she executed her will, and that her will was not the product of undue influence exerted by Ms. Castellanos or Ms. Monroe. Rather, her will is a reflection of the relationships she built during her lifetime, and the relationships she most appreciated as her demise became inevitable.
Based upon the foregoing, the Appellants' claims are denied. Counsel for the prevailing party shall present an order consistent with this Court's decision.
[1] These are the words of Robert Benchley, American humorist, newspaper columnist and film actor.
[2] Available at http://www.youtube.com/watch?v=9SjI6Wl175I. `Never on Sunday' was a popular song during the early 1960s, winning the Academy Award in 1960 for Best Original Song. While it has been covered by many American artists, the version by Connie Francis is the best-known and best-loved by Italian Americans. *Page 1